March 23, 1908.

———o———

No. 4376.

Court of Appeal, Parish of Orleans.

## JAMES W. MARTIN VS. THE THAMES & MERSEY MARINE INSURANCE CO., LTD.

Where the application for insurance does not state what propor-

tion of the cargo is to be carried "under deck" and what "on deck," but the proof is that the custom obtains in the trade in which the vessel is engaged to carry part of the cargo "on deck" and part "under deck," and further shows that the insurer had knowledge of this custom; and besides, had agreed with the insurer before the application for insurance was made that part of the cargo could be carried "on deck" and part "under deck," and the vessel sails and is lost before the insurer has had an opportunity to ascertain how the cargo was distributed in order to adjust the rate of premium, held:—The policy covered the entire cargo.

Appeal from Civil District Court, Divisions E and A.

Carroll & Carroll, for Plaintiff and appellee.

Farrar, Jonas & Kruttschnitt, for Defendant and Appellant.

ESTOPINAL, J. The basis of this suit is a marine contract of insurance, the plaintiff averring substantially in his petition that, a certificate of insurance of date November 28, 1902, was executed by the defendant company, and constituted a contract to insure him against loss from marine risks on two hundred and one barrels of molasses in the sum of two thousand eight hundred and fourteen dollars ($2,814.00), shipped on board the schooner "Lizzie Haas," from Live Oak Plantation, in the parish of Terrebonne, Louisiana, to New Orleans; that the cargo of molasses was shipped on aforenamed schooner on November 28, 1902, and a few days later, while on her way to New Orleans, the schooner was wrecked in the Gulf of Mexico, and her cargo was a total loss; that the defendant insurance company has paid the loss on 125 barrels of molasses, but refuses to pay the loss upon seventy- six barrels of molasses, amouting to the sum of one thousand and sixty-four dollars ($1,064.00), less the premium of 6 per cent agreed upon for the portion of shipment loaded upon deck.

The defendant tenders the general issue, admits the execution of the certificate, but denies specially that there was any agreement between the plaintiff and defendant which contemplated insurance on any part of the cargo carried "upon deck," and that the intention of the parties and their conception thereof is evidenced by the act of defendant, before the loss, in sending a bill to the plaintiff for the insurance of the cargo of molasses

at the rate of one and one-half per cent, which was the rate charged for insurance of goods carried under deck, and to which bill plaintiff did not demur.

The following note of evidence is found in the record:

"It is admitted by the defendant that the 76 barrels of molasses, the price of which is sued for, were totally lost from the schooner "Lizzie Haas," on the voyage to which the policy related, a few days after November 28th, 1902, to-wit: the ——— day of December, 1902, on her voyage from Live Oak Plantation to the City of New Orleans.

That the value of said seventy-six barrels of molasses was Fourteen ($14.00) Dollars per barrel.

That the plaintiff was the owner of the molasses.

That the loss was caused by a peril of the sea.

That proofs of loss, in due form, were tendered to defendant by the plaintiff.

That shortly after the filing of proofs of loss, the defendant refused to pay for the loss of said Seventy-six barrels of molasses carried on deck, on the ground that the same was carried ".on deck."

All of the above facts being admitted, they will be eliminated from the discussion of the case.

There is only one open question remaining, and it is mainly one of fact, to-wit: What was the intention or in the contemplation of the parties at the time of the application for insurance by the plaintiff?

George C. Bright, manager of the Insurance Department of Lucas E. Moore, agents of defendant Company in this State, testified as follows:

Q. Did Mr. Martin, at the time of his application, ask for your rates of insurance?

A. He asked me for rates a month beforehand; he said nothing about the rate at the time the application was put in.

Q. Did you give him the rates?

A. I asked for "under deck," the charge was one and one-half (1 1-2) per cent, and "on deck," four times as much, six (6) per cent. I told him this on the street.

Bright goes on to say that nothing was said by Martin relative to carrying a portion of the cargo "on deck." Martin, on the other hand, testifies that he had a conversation with Mr. Bright, just as stated by the latter, in which he (Bright) named

two rates, one and a half under deck, and four times that amount on deck; that it was understood the Captain had the privilege of carrying part of the cargo on deck; that nothing was said about the relative proportions of on deck and under deck loading, or anything of the kind. Martin says he was telephoned to that the vessel was loaded, and to effect insurance on Two Hundred and One (201) barrels. He inquired how much was on deck and how much under deck, but was not informed. He says: "I made out application just for 201 barrels, *knowing the understanding was the vessel had the privilege of carrying the molasses on deck, and the rate had been agreed upon.* Martin then relates a conversation with Bright after the loss, in reference to the number of barrels carried on deck, and states that Bright said: "Well, make it that way, that it didn't make any difference, *it is only a question of rates, and that can be easily adjusted.*" This is denied by Bright, but his testimony appears to have been given in an uncertain way, and evidently did not impress the trial judge favorably.

The plaintiff's statement that the rates had been fixed, and that it was understood that the vessel would carry part of the cargo on deck, is corroborated in a way by the application for insurance which he made. Certainly, had the cargo been entirely under deck, he would have supplied in the proper "column" in the application the rate he intended to pay, or else noted on the application that the entire cargo was under deck. He did neither, and the inference is unavoidable that he intended the rates should be supplied when it was assertained what proportion of the cargo was carried under deck, and what on deck.

On cross-examination Mr. Bright was asked:

Q. When he asked the rate it was understood the molasses might be shipped either way, was it not?

A. *No sir; not all of it, only a small proportion on deck.*

This statement of Bright's is not consistent with answers by him on the same point in his direct examination. Martin's statement in reference to "on deck" cargo is borne out.

Bright is asked: "Is it not certain if the rate had been for under deck loading, the rate would have been filled in on the application?

He answers: "No, sir; I can show you, I suppose two-thirds of our applications have no rates at all, simply because the parties have *an understanding between them.*

134

Can it be that the *understanding* referred to means the adjusting of rates when the distribution of the cargo is to be ascertained?

Bright says, when asked whether at the time of the conversation with Martin, he objected to accepting the molasses on deck, he replied that he did not object to a certain proportion being loaded in that way. We find from his answers that Bright had notice, derived from a conversation with Martin as well as from the nature of the application for insurance made by the latter, and also by the custom of the trade conducted by such boats, that part of the cargo would be carried on deck, and his assumption that the vessel was loaded under deck and his rendering of a bill for premium at the rate of one and one-half sI 1-2) per cent for under deck cargo, was an unwarranted assumption, and of itself can have no binding effect on the plaintiff.

"But," says the defendant, "the assured accepted the bill and did not dispute it until after the loss occurred."

From our appreciation of the facts of this case, we think this contention has no force. Too short a time elapsed between taking the policy, rendering the bill and the loss.

A careful reading of the testimony of the plaintiff (Martin) and Bright, defendant's agent, obliges us to resolve the facts in reference tot he contract of insurance in favor of plaintiff.

Our learned brother of the District Court, who saw and heard the witnesses, says:

"I heard the plaintiff and defendant's employees testify, and I have no doubt of the correctness of plaintiff's version. His statement was affirmative and positive, that of defendant's agent negative. This was his one personal contract, while defendant's agent was dealing with many such matters. Whenever there is a conflict. I find for the plaintiff, while in no way reflecting on the other witnesses."

Counsel argued at the bar that a cargo carried on deck is not covered by a general application and certificate of insurance, but that a special contract is necessary for such cargo, unless the cargo, from its very nature, can be loaded only "on deck," as for instance a cargo of elephants. All parties are charged with knowledge, as it were, that such a cargo cannot be loaded under deck, says counsel.

This is very true, but is not the legal effect the same when it is shown that the build and construction of the vessels engaged in this trade is such that it is intended they should carry part of their cargo on deck; when it is shown further that schooners in this trade must carry "on deck," or else are unable to live in the trade?

It occurs to us that knowledge is conveyed by this custom of carrying on deck cargoes, as forcibly and effectively as though the cargo was of a character which in its nature did not permit of its being carried or loaded on deck.

There is no issue raised in the pleadings as to whether the cargo was properly distributed, and the evidence on this point need not be discussed. As we have said before, the facts point to an arrangement whereby plaintiff was to carry part of his cargo on deck and part under deck, and the question of rates is all that remained to be settled.

It is shown that Martin, when informed that the boat was loaded and ready to sail, endeavored to secure information before applying for insurance, as to the distribution of the cargo. Failing to get this data, he made a general application, and, to our mind, significantly avoided naming the rate he wished to pay. He knew he had goods under deck and on deck as well, but had been unable to ascertain figures when the boat sailed.

Our attention is directed by counsel to the testimony of seafaring men, who testified to the effect that it is usual for vessels plying on the Gulf Coast to indicate at the time of applying for insurance the portion of cargo carried under, and that carried on deck. That seems to establish the custom as relates to the method of securing insurance, but the facts in this case show that the details of the distribution of the cargo and the rates of premium to be charged, was to be ascertained at some future time. In other words, the transaction in this case is taken out of any custom which may obtain for boats plying on the Gulf.

We think the judgment appealed from is not error, and should be affirmed, and, accordingly, it is affirmed.

March 23, 1908.

Application for rehearing April 6, 1908.

Application not considered April 20, 1908.